# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

**STEVEN EUGENE HENDERSON**                    **CIVIL ACTION**

**VERSUS**                                                  **No. 19-13072**

**ATMOS ENERGY, ET AL.**                                  **SECTION I**

## ORDER AND REASONS

Before the Court is defendant Atmos Energy Corporation's ("Atmos") motion[1] for summary judgment. Plaintiff Steven Eugene Henderson ("Henderson") claims that Atmos's negligence caused significant injuries when, on October 21, 2018, he slipped and fell on mud while exiting his car next to a worksite.[2] Henderson opposes the motion,[3] and Atmos has submitted a reply to Henderson's opposition.[4]

As explained below, the Court concludes that Henderson has not offered sufficient evidence to raise a dispute of material fact as to whether (1) Miller Pipeline was Atmos's employee, rendering Atmos directly liable for its negligence, or (2) Atmos had the right to control Miller Pipeline such that it should be liable for its negligence, notwithstanding its independent contractor status. Summary judgment is appropriate.

## I.        BACKGROUND AND FACTS

---

[1] R. Doc. No. 66.
[2] R. Doc. No. 1-3, at 4.
[3] R. Doc. No. 71.
[4] R. Doc. No. 75.

This case arises from injuries allegedly suffered by Henderson on October 21, 2018.[5]  Henderson alleges that Atmos "had been digging holes . . . in the sidewalk areas to access pipelines," and that "[l]arge piles of dirt were the byproduct of said holes and had [sic] one small green pole next to it and a net over it."[6]  Henderson claims that the "netting did not prevent mud from running down the pile and accumulating on surrounding property and sidewalks."[7]  Henderson alleges that, after stepping out of his car, he "slipped on mud outside the green pole and construction netting and . . . fell on the sidewalk."[8]  Henderson proceeds to argue that Atmos caused this accident by (1) "creating an unsafe and hazardous worksite and failure [sic] to safeguard against the same;" (2) "failing to properly mark said hazardous worksite with signage; and" (3) committing "other acts of fault."[9]

Despite the wording of Henderson's allegations, the parties agree that Miller Pipeline—not Atmos—performed the work that Henderson alleges led to his injuries.[10]  And, as is discussed below, the parties also agree that Atmos had neither constructive nor actual notice of the mud that led to Henderson's alleged fall.  Because of this, the instant motion turns on (1) whether Miller Pipeline is Atmos's employee under Louisiana law, such that Atmos can be held directly liable, and (2) whether, if

---

[5] R. Doc. No. 1-3, at 4 (state court petition).
[6] *Id.* at 4.
[7] *Id.*
[8] *Id.*
[9] *Id.* at 5.
[10] R. Doc. No. 66-1, at 1 ¶ 2 (Atmos's statement of material facts); R Doc. No. 71-1, at 1 ¶ 2 (Henderson's statement of material facts, claiming that Atmos "assigned all work to be performed to [Miller Pipeline]").

Miller Pipeline is an independent contractor, Atmos can nonetheless be found vicariously liable.

The following facts are drawn from the parties' briefing and exhibits. The Court has also drawn on factual statements offered in defendant's statement of uncontested facts that are uncontroverted by plaintiff's opposition or his own statement of uncontested facts.[11]

<u>The General Relationship Between Atmos and Miller Pipeline</u>[12]

The parties agree that Atmos contracted the work on the project at issue to Miller Pipeline by way of a long-standing and frequently amended Master Services

---

[11] Atmos argues that, pursuant to Local Rule 56.2, "[b]ecause plaintiff did not controvert any material facts set forth by Atmos," the material facts included in Atmos's statement should be deemed admitted in their entirety. R. Doc. No. 75, at 2; *see, e.g.*, *Doe v. Loyola University*, No. 18-6880, 2020 WL 1030844, at *7 (E.D. La. Mar. 3, 2020) (Feldman, J.) ("Because the plaintiff failed to controvert any of [the facts included in the defendant's 56.2 statement] . . . Local Rule 56.2 requires that they be deemed admitted."). While this is true, the Court need not rely on the rule, as Henderson's opposition also offers no suggestion that any of the facts are untrue. Henderson's own 56.2 statement offers legal conclusions, rather than facts, including: "[The Master Services Agreement] fails to establish an independent contractor relationship" and "Pursuant to [the task request], [Atmos] retained the right to control and supervise all work performed by [Miller Pipeline]." The Court cannot rely on such conclusory statements.

[12] The Court is aware that the expert report of plaintiff's proposed rebuttal expert, Eric Parnell, includes a number of statements that can be summarized as concluding that Atmos is responsible for any negligence by Miller Pipeline. *See* R. Doc. No. 77-2 (exhibit to motion to strike). Parnell is the subject of a motion to strike on the grounds that his disclosure was untimely by a matter of months. *See* R. Doc. No. 77. Henderson has argued that because he intends to offer Parnell only to rebut Atmos's expert testimony, his disclosure is timely. R. Doc. No. 80. And Henderson has not relied on Parnell's proposed testimony in his opposition to the instant motion. While the Court is inclined to agree with Atmos's position that Parnell should be excluded from testifying, it need not make such a decision. His conclusions as to Miller Pipeline's legal status would not be admissible at trial.

Agreement[13] (the "MSA") and that this particular work was conducted pursuant to a task request[14] executed August 10, 2018.[15]  The task request calls for Miller Pipeline to install a new main and service line, along with other related tasks.[16]  And uncontroverted witness testimony confirms that the holes which generated the dirt at issue were, in fact, dug by Miller Pipeline, not Atmos.[17]

The MSA, which refers to Miller Pipeline as "CONTRACTOR" and Atmos as "COMPANY" throughout, contains an independent contractor provision, which states:

> CONTRACTOR will act as and be deemed to be an independent contractor.  Neither CONTRACTOR nor any of its employees will act as, nor be deemed to be, an agent or employee of COMPANY. *CONTRACTOR will have the sole right to control and directly supervise the method, manner and details of the Work.*[18]

The MSA also provides that "CONTRACTOR will be solely responsible for the proper storage, transportation and disposal of any product or waste . . . used or generated in connection with the Work[.]"[19]

The MSA also explains the relationship between it and the task requests through which Atmos assigned Miller Pipeline work.  The MSA "does not authorize

---

[13] R. Doc. No. 66-7 (sealed and unredacted copy of the MSA).
[14] R. Doc. No. 66-8 (sealed and unredacted copy of the task request).
[15] R. Doc. No. 66-3, at 2–3 ¶¶ 4–12 (affidavit of Scott Serou ("Serou"), Atmos engineering services manager).  The Court notes that while Serou's affidavit and Atmos's statement of facts suggest that the task request was issued in or around October 2018, the task request appears to have been, in fact, issued in August 2018. R. Doc. No. 66-8, at 1.
[16] R. Doc. No. 66-8, at 1.
[17] R. Doc. No. 66-4, at 6 (deposition of Louis Duhe).
[18] R. Doc. No. 66-7, at 25 (emphasis added).
[19] *Id.*

any Work to be performed . . . . Work authorized is that identified in a [task request] issued pursuant to" the MSA.[20]  While a task request may contain work "instructions" and "specifications," it may not "add to or modify any . . . term or condition of [the MSA]."[21]

The MSA allows Atmos to terminate the agreement at will, by written notice.[22] It adds that, "[i]n the event [the MSA] is terminated, [Atmos's] only liability will be to pay [Miller Pipeline] the unpaid balance due for Work actually performed."[23]  It also includes a "Termination for Default" provision, which provides that, in the event Atmos concludes that one of a number of conditions of default have occurred, Atmos may,

> without prejudice to any other right or remedy available to it[,] after giving CONTRACTOR seven (7) days' written notice, terminate the [MSA] and take possession of the Work Site.  In the event of such a termination, COMPANY may use . . . CONTRACTOR's equipment and materials and may finish the Work by whatever method COMPANY may deem expedient . . . . If the unpaid balance of the [agreed price] [exceeds] the expense of finishing the Work . . . such excess will be paid to CONTRACTOR.  If the expense of finishing the Work [exceeds the] unpaid balance, CONTRACTOR will pay the difference to COMPANY within fifteen (15) days of receiving an invoice for same.[24]

The provision also dictates that Atmos's determinations as to whether a default has occurred are binding.[25]

---

[20] *Id.* at 3.
[21] *Id.* at 2.
[22] *Id.* at 28.
[23] *Id.* at 29.
[24] *Id.*
[25] *Id.*

Additionally, the MSA incorporates Miller Pipeline's "Schedule of Charges," which sets forth rates for various pieces of equipment and specialized personnel, as well as an hourly rate for a crew.[26]

### Miller Pipeline's Contractual "Scope of Work"

The task request for the work underlying Henderson's complaint describes the project as "Westwego – Avenue A, Ph. 2 Main & Service replacement."[27]  It includes an estimate of the time required for the project and the cost of labor, as well as a timeframe in which the work should be completed.[28]

The request includes a "Scope of Work" section, setting forth parameters for the project.[29]  The majority of the parameters set forth in the "Scope of Work" section detail—unsurprisingly—the scope of the work to be done.  First, the section makes clear that Miller Pipeline is to "[p]rovide necessary supervision, labor and equipment to complete [the] project."[30]  And, in addition to replacing the pipes, Miller Pipeline was to, among other things, "[s]tabilize and restore the disturbed surface area . . . prior to leaving the jobsite" and "provide temporary repair for all paving cuts."[31]  Similarly, Miller Pipeline was to "[i]nstall [s]afety fence around all open ditches . . . [and p]rovide all erosion control . . . [and] barricades . . . required."[32]

---

[26] *Id.* at 8–16.
[27] R. Doc. No. 66-8, at 1.
[28] *Id.*
[29] *Id.* at 2.
[30] *Id.*
[31] *Id.* at 3.
[32] *Id.*

However, the "Scope of Work" section also contains some provisions that could be construed as giving Atmos control over *how* Miller Pipeline should perform the work, rather than specifying merely *which* work should be performed. Notably, one provision states that "CONTRACTOR's proposed bore profile and arc radius must be approved by COMPANY Engineering prior to commencement of work."[33] Moreover, the task request provides that "all work [will be performed] in accordance with" Atmos's maintenance and procedure manuals.[34]

The task request sets forth Atmos's right to "inspect ongoing and completed work."[35] Additionally, Atmos "has the right to have any welder or crew [it] deem[s] not competent to perform work on [its] system to be [sic] removed from the project."[36] The task request also states that Atmos "shall have the final say in any disputes that CONTRACTOR may have," though it is not clear if this refers to disputes between Atmos and Miller Pipeline.[37] It also provides that any work and expense beyond the scope of the initial task request deemed necessary must be approved by Atmos and that Miller Pipeline should provide invoices for the project on a weekly basis.[38]

---

[33] *Id.* at 4.

[34] *Id.* at 2.

[35] *Id.* at 4.

[36] *Id.* Henderson argues in his opposition that the use of the word system is an "admi[ssion]" that the worksite is Atmos's "own." R. Doc. No. 71, at 8. The Court thinks the word system is better understood in the context of the document to refer to the pipes on which work was being performed. Regardless, Henderson's petition does not appear to state a claim for premises liability, referencing no statute and instead claiming that Atmos is liable for its "negligence." R. Doc. No. 1-3. With that in mind, the argument seems orthogonal.

[37] R. Doc. No. 66-8, at 4.

[38] *Id.* at 4–5.

Finally, the task request states that Atmos is responsible for obtaining the required permits, providing all materials not detailed in the request, and providing inspection—though it may fulfill its inspection obligation through a third party.[39]

<u>The Work at Avenue A and Henderson's Fall</u>

While the task request dictated that the work was to be completed by mid-September, it is undisputed that the site was still open on October 21, 2018, when Henderson fell.[40]  It is also undisputed that no Atmos employees worked on or inspected the site between October 19 and the accident.[41]  It is similarly undisputed that responsibility for inspection of this site had been contracted to Magnolia River Services, Inc. ("Magnolia")[42] pursuant to an agreement (the "Magnolia MSA").  That agreement required Magnolia to "[m]onitor the overall job-site appearance" and "[o]bserve if . . . all applicable safety policies" are being followed and to "notify Atmos . . . immediately" of any problems.[43]  It is also undisputed that Magnolia did not notify Atmos of any unsafe condition—including improperly secured dirt.[44]

---

[39] *Id.* at 2.

[40] *See generally* R. Doc. No. 66-2 (Atmos's memorandum acknowledging that the relevant time-period was in late October); R. Doc. No. 71 (Henderson's opposition indicating same).

[41] *See* R. Doc. No. 66-3, at 3 ¶ 9 (Serou's affidavit); *see also* R. Doc. No. 66-4, at 6 (deposition testimony of Louis Duhe that the workers at the site drove Milller trucks and that he did not recall seeing any Atmos presence).

[42] R. Doc. No. 66-3, at 3–4 ¶¶ 13–14.

[43] R. Doc. No. 66-9, at 15, 18–19 (sealed Magnolia MSA).

[44] R. Doc. No. 66-3, at 4 ¶ 15.

According to Henderson,[45] it had not rained and there was no hazardous mud when he came home for the night on the evening of Saturday, October 20, 2018.[46] The next morning, at 6:00 a.m., Henderson left his home to get breakfast.[47]  He had no difficulty getting into his car.[48]  However, when he returned from breakfast, he stepped out of the car—having observed no obvious hazard—slipped, and fell.[49]  It is undisputed that Atmos was unaware of any hazard prior to the accident.[50]

## II. LEGAL STANDARD

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, a court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The party seeking summary judgment need not produce evidence negating the existence of a material fact; it need only point out the

---

[45] Atmos does not challenge Henderson's description of the event.

[46] R. Doc. No. 66-5, at 8 (Henderson's deposition testimony).

[47] *Id.*

[48] *Id.* at 9–10.

[49] *Id.* at 10.

[50] R. Doc. No. 66-3, at 4 ¶ 16.  Henderson's opposition to the instant motion acknowledges Atmos's position that it "had no actual or constructive notice" and argues that this is irrelevant because "constructive notice does not apply" to injuries "sustained at a construction site, not a commercial or merchant establishment."  R. Doc. No. 71, at 12. Atmos's memorandum in support of the motion devoted three full pages to demonstrating that there was no dispute; Henderson's opposition does not rebut the assertion or cite facts that refute it.  *Id.*

absence of evidence supporting the other party's case.  *Id.*; *see also Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195–96 (5th Cir. 1986) ("There is no sound reason why conclusory allegations should suffice to require a trial when there is no evidence to support them even if the movant lacks contrary evidence.").

Once the party seeking summary judgment carries that burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial.  *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).   The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted).  Rather, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . . the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical and Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citations omitted). The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue.  *See Anderson*, 477 U.S. at 248.   The nonmoving party's evidence, however, "is to be

believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255.

### III.   LAW AND ARGUMENT

Louisiana Civil Code Article 2315 states that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." La. Civ. Code. art. 2315(A). "To prove negligence under Louisiana law, a plaintiff must show that: (1) 'the defendant had a duty to conform his conduct to a specific standard;' (2) 'the defendant's conduct failed to conform to the appropriate standard;' (3) 'the defendant's substandard conduct was a cause in fact of the plaintiff's injuries;' (4) 'the defendant's substandard conduct was a legal cause of the plaintiff's injuries;' and (5) 'actual damages.'" *Randle v. Tregre*, 147 F. Supp. 3d 581, 593 (E.D. La. 2015) (Africk, J.) (quoting *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 633 (La. 2006)).

"Masters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." La. Civ. Code art. 2320. "For an employer to be held liable for the actions of an employee under article 2320, the plaintiff must show [among other things] that . . . a master-servant relationship existed between the tortfeasor and the employer." *Hughes v. Goodreau*, 836 So. 2d 649, 656 (La. Ct. App. 1st Cir. 2002) (citing *Brumfield v. Gafford*, 768 So. 2d 223, 227 (La. Ct. App. 1st Cir. 2000)). "The distinction between employee and independent contractor status is a factual determination to be decided on a case-by-case basis." *Hicks v. BP Exploration & Prod., Inc.*, 310 F. Supp. 3d 754, 760 (E.D. La. 2018) (Africk, J.) (quoting *McLeod v. Moore*, 7 So.3d 190, 192 (La. Ct.

App. 2d Cir. 2009)).  "The existence of an independent contractor agreement is not necessarily dispositive of the issue of whether [a worker] is an independent contractor, as opposed to an employee . . . . The courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the [company] over the [individual's] activities." *Arroyo v. E. Jefferson Gen. Hosp.*, 956 So. 2d 661, 664 (La. Ct. App. 5th Cir. 2007).  Five factors should be present for an independent contractor relationship to exist:

1. There is a valid contract between the parties;

2. The work being done should be of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;

3. "The contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;"

4. A specific price is set for the overall undertaking; and

5. A specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.

*Hicks*, 310 F. Supp. 3d at 760 (citing *Ledent v. Guar. Nat. Ins. Co.*, 723 So. 2d 531, 537–38 (La. Ct. App. 2d. Cir. 1998); *Hickman v. S. Pac. Transp. Co.*, 262 So. 2d 385, 390–91 (La. 1972)).  The test evaluates the right to control the worker, rather than actual supervision.  *Hickman*, 262 So. 2d at 391.

"[A] principal is not liable for the torts of an independent contractor unless the principal exercises operational control over or expressly or impliedly authorizes the independent contractor's actions." *Goodie v. ExxonMobil Oil Corp.*, No. 13-5228, 2014 WL 1764777, at *3 (E.D. La. May 2, 2014) (Africk, J.) (quoting *LeJeune v. Shell Oil Co.*, 950 F.2d 267, 270 (5th Cir. 1992) (quotation omitted)). "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way." *Id.* at *9-11 (quoting *Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 564 (5th Cir. 2003)). "'[I]nspection of the work done by an independent contractor and direction as to the final results of the project is insufficient to support a conclusion that the principal has retained enough control over the project' to be liable for the independent contractor's negligence." *Koerner v. Vigilant Ins. Co.*, No. 16-13319, 2017 WL 4682295, at *12 (E.D. La. Oct. 18, 2017) (Africk, J.) (quoting *Nippa v. Chevron, USA*, 774 So. 2d 310, 315 (La. Ct. App. 4th Cir. 2000)).

Atmos argues that summary judgment is appropriate because (1) Miller Pipeline is an independent contractor and (2) Atmos did not exercise operational control over Miller Pipeline, which Atmos acknowledges would render it vicariously liable for Miller Pipeline's alleged negligence.[51] Atmos also argues that it cannot be liable for conditions at the Miller Pipeline work site because it had no actual or

---

[51] R. Doc. No. 66-2, at 3–4.

13

constructive notice and "Louisiana courts find no liability in cases alleging dangerous conditions where no actual or constructive notice of such conditions is present."[52]

Henderson argues that summary judgment is inappropriate. He notes that a contract labeling someone an "independent contractor" cannot irrefutably establish that this is the nature of their relationship with another party in the face of evidence that the relationship is in fact one of employer and employee.[53] Henderson identifies the five-factor test used by Louisiana courts and argues that the factors confirm that Miller Pipeline was, in fact, Atmos's employee.[54] This is so, Henderson explains, because the independent contractor test evaluates the right to control, rather than the actual exercise of such control.[55]

Henderson argues extensively that, because the MSA is "boilerplate," it is insufficient to establish that Miller Pipeline is an independent contractor rather than an employee.[56] Nonetheless, Henderson concedes, it is a "valid contract," which satisfies the first factor of the independent contractor test.[57] Henderson then argues

---

[52] *Id.* at 9 (citing *Burns v. Sedgwick Claims Mgmt. Servs., Inc.*, 165 So. 3d 147, 153 (La. Ct. App. 5th Cir. 2014)). Because the Court concludes that Miller Pipeline is an independent contractor and was not subject to operational control by Atmos, it need not evaluate this argument.

[53] R. Doc. No. 71, at 2 (note that pincites to Henderson's opposition refer to the page number at the top right of the page, rather than the numbering at the bottom of the page, which begins at '2').

[54] *Id.* at 3 (citing *Amyx v. Henry & Hall*, 79 So. 2d 483, 486 (La. 1955)).

[55] *Id.* at 4 (citing *Hickman*, 262 So. 2d at 391).

[56] *Id.* The MSA is "boilerplate," according to Henderson, because it (1) substitutes "CONTRACTOR" and "COMPANY" for Miller Pipeline and Atmos and (2) includes sentences that use "every synonym and phrase." Henderson adds that "[i]f this were not boilerplate . . . then the language would actually include what is it [sic] that needs to be done specifically for each employee." *Id.*

[57] *Id.* at 5.

that, because the MSA is boilerplate and the task request "provides the substance of the means and methods for accomplishing the job at Avenue A," the Court should focus on it—and, the Court supposes, not the MSA.[58]   And the task request is conclusive evidence that Atmos employs Miller Pipeline, Henderson explains, because it "details meticulously how the entire job assigned . . . should be accomplished[,] with over fifty individual mandates from Atmos."[59]   This alone, Henderson assures, "indisputably places Atmos in a position of supervision and control over all of the work done by [Miller Pipeline].  Otherwise . . . a meticulously crafted list would not need to be provided."[60]   Serou's testimony, Henderson explains, is irrelevant because it relates only to Atmos's lack of actual control.[61]   The task request reserves Atmos's inspection right and, in doing so, Henderson argues, it "directly implicates Atmos . . . as an employer because it had reserved the right to limitlessly control and supervise all of the work done by [Miller Pipeline]."[62]   Henderson finds further support for this position in the fact that Atmos has the right to have any welder or crew deemed not competent removed.[63]

Next, Henderson turns to the independent contractor factors.  He argues that the second and third factors are not satisfied because (1) "[Atmos]'s extraordinary amount of control prohibits [Miller Pipeline] from doing [its] work in an independent

---

[58] *Id.* at 6.
[59] *Id.*
[60] *Id.*
[61] *Id.*
[62] *Id.* at 6–7.
[63] *Id.* at 7.

nature," (2) "Atmos imposes exclusive means for accomplishing the work assigned," and (3) "Atmos imposes significant control over the methods."[64]  The fourth and fifth factors are not met because "[Atmos's] contract does not provide for a specific price and allows Atmos to terminate the contract at will."[65]  The task request "provides for weekly invoices, no specific price[,] and is subject to termination at will without a corresponding liability for breach."[66]

As support for his position, Henderson cites *Honeycutt v. Deutschmann*, 976 So. 2d 753, 756 (La. Ct. App. 5th Cir. 2008).  As in *Honeycutt*, Henderson explains, "discovery revealed a genuine issue of material fact as to whether there was an independent contractor or employee/employer relationship."[67]  According to Henderson, *Honeycutt* dictates that a principal "likely creates an employee/employer relationship by" assigning certain tasks to the employees, controlling the hours of work, and making contractors "gain approval for additional work."[68]

Henderson sees a parallel.  Like the employer in *Honeycutt*, Atmos rendered Miller Pipeline an employee by controlling "the hours of work."[69]  "Atmos sets its rates for the first fifty hours" and will not compensate for unapproved additional work.  The "requirement of having extra hours be pre-approved to be compensable absolutely

---

[64] Henderson adds extensive argument addressing the provisions mentioned in the facts section, which can be summarized by saying that he believes they represent Atmos dictating the means by which Miller Pipeline should do its work—"Miller [Pipeline] cannot independently accomplish the work assigned."  *Id.*
[65] *Id.*
[66] *Id.* at 8.
[67] *Id.* at 10.
[68] *Id.*
[69] *Id.*

sets a cap at fifty hours a week."[70]  Henderson then argues that, by requiring weekly invoices, Atmos "controlled" the work.  "[B]y submitting the invoices weekly, Atmos engaged in actual control over [Miller Pipeline's] work."[71]

Henderson argues in the alternative that, should the Court determine Miller Pipeline is an independent contractor, Atmos's "reservation of rights to control and supervise makes it liable as principal."[72]

Finally, Henderson addresses Atmos's argument that it cannot be liable because it had no actual or constructive notice of the conditions alleged to have caused the negligence.  Confusingly, Henderson argues only that "constructive notice does not apply" because Henderson "sustained his injuries at [Atmos's] construction site, not a merchant or commercial premise [sic].  Thus, the law cited is inapplicable to the facts and shows [that Atmos] is not entitled to judgment as a matter of law under their own misuse of the law."[73]

In reply, Atmos argues first that Henderson's 'boilerplate' argument ignores the specific language of the MSA's independent contractor provision.[74]

Atmos also argues that Henderson's opposition to summary judgment boils down to the notion that the "over fifty individual mandates" in the task request render Miller Pipeline an employee—and that this argument is hard to reconcile with

---

[70] *Id.* at 11.

[71] *Id.*  The Court assumes that Henderson means that Atmos controlled Miller Pipeline by requiring the weekly submission of invoices.

[72] *Id.* at 12.

[73] *Id.* at 11.  As the Court does not reach Atmos's argument on this point, it need not address the implications of Henderson's concession.

[74] R. Doc. No. 75, at 2.

the fact that the task request "specifically requires *Miller* to 'provide [the] necessary supervision, labor and equipment to complete [the] project.'"[75]  Atmos notes that the task request specifically enumerates tasks "[Miller Pipeline] agreed to perform *without the supervision of Atmos*."[76]  Based on the language of the MSA and the task request, Atmos had no control over the work at the time it was being performed on site, and did not retain any right to supervise the work.[77]

Atmos acknowledges that it retains the right to reject welders who it deems incompetent to work on its system, but it argues (citing no case law) that this "does not meet the requirements to establish an employer-employee relationship."[78]

Atmos then addresses the independent contractor factors.  Noting that the first factor is undisputed, Atmos argues that the second factor is met because "no employee of Atmos inspected the work . . . or performed any work at the site" during the time period in question.[79]  Atmos rejects Henderson's argument that the requirement of weekly invoices is tantamount to control, pointing out that invoices are issued for work already performed.[80]

Atmos argues that the third factor (calling for specific work to be done according to the independent contractor's own methods) is met because the task request merely describes the work to be performed, and explicitly states that Miller

---

[75] *Id.* at 3 (quoting R. Doc. No. 66-8, at 2) (emphasis retained, alteration omitted).
[76] *Id.* (emphasis retained).
[77] *Id.* at 6.
[78] *Id.* at 4.
[79] *Id.* at 5.
[80] *Id.* at 6.

Pipeline is to supervise the work.  Atmos also notes that inspections were in fact carried out by Magnolia, not Atmos.[81]

Atmos argues that the fourth factor is met because the MSA incorporates Miller Pipeline's schedule of charges, which sets forth particular rates for personnel hours and equipment.[82]  Atmos explains that "[t]his is generally how independent contractors are paid for their work, since it cannot be determined prior to the conclusion of the project the number of hours it will ultimately take for the project to be completed.  However, the [task request] also sets forth a specific estimated price . . . for the project."[83]

Finally, Atmos argues that the fifth factor—that the contract sets a specific time or duration and does not allow for termination at will without liability for breach—is also met.  Atmos notes that the task request includes a time frame for the project.[84]  Atmos also argues that the contract does not create an at-will relationship because it provides that, in the event of a termination for default before the completion of a project, Miller Pipeline is responsible for paying Atmos the difference between the estimate and the actual cost of completing the work.[85]

## IV.   ANALYSIS

As explained below, the Court concludes that summary judgment is appropriate.

---

[81] *Id.* at 7.
[82] *Id.* at 8.
[83] *Id.*
[84] *Id.*
[85] *Id.* at 9.

### A.  *Miller Pipeline is an Independent Contractor, not an Employee*

Henderson's argument that Atmos employed Miller Pipeline relies entirely on the MSA and task request.  Moreover, Henderson does not challenge any of Atmos's evidence as to its actual involvement at the worksite—he instead argues (correctly) that its lack of actual control is irrelevant if its agreement with Miller gives it the right to control.  Consequently, there is no dispute as to the material facts, only their legal significance.

Henderson is correct that the MSA's description of Miller Pipeline as an "independent contractor" is not determinative.  Louisiana law is clear on this point.  *See, e.g.*, *Honeycutt*, 976 So. 2d at 755–56 (reversing trial court grant of summary judgment because, despite contract that supported finding of independent contractor status, "testimon[y] presented indicate[d] questions of fact regarding whether the work performed . . . was of an independent nature, such that [contractor] could employ non-exclusive means in accomplishing it and whether the work could be done according to the independent contractor's own methods, without being" controlled).  Common sense also dictates the same result.

However, our case is easily distinguishable from *Honeycutt*, which teaches that a contract alone will not convey independent contractor status when testimony indicates a different type of relationship, creating a genuine issue of material fact.  *Id.*  There is *no* testimony or other extrinsic evidence here to suggest that the MSA and task request are deceiving.  Indeed, the affidavit of Serou and the testimony of Duhe are completely consistent with Atmos's position.  Here, Henderson argues that

20

the task request and MSA are *internally* inconsistent, purporting to give Miller Pipeline control over its work but in fact leaving Atmos with the right to control.

Henderson's argument—that the MSA alone cannot support summary judgment is flawed in numerous respects. First, the MSA is not "boilerplate." It includes Miller Pipeline's fee schedule, and it incorporates by reference the task request, which Henderson agrees is detailed. Second, the MSA is not Atmos's only evidence—the task request, Serou's affidavit, and, to some degree, Duhe's testimony all support the notion that Miller Pipeline was an independent contractor. Third, the argument is irrelevant. At the summary judgment stage, it is not the moving party's responsibility to identify irrefutable evidence in support of its case. Atmos need only point to the absence of evidence in support of Henderson's case, at which point the burden to provide some evidence shifts to Henderson. *See Matsushita*, 475 U.S. at 587. If Henderson offered credible evidence that Atmos's actual rights exceeded what is set forth in the MSA and task request, no amount of specificity would merit summary judgment. But he does not.

Because the parties seemingly agree that the Court should use the identified five factors to evaluate the nature of the Atmos-Miller Pipeline relationship, it will do so, though the court notes that the test is not rigid and should be applied on a case-by-case basis. *See, e.g., Hicks*, 310 F. Supp. 3d at 760. As previously stated, the test suggests that an independent contractor relationship exists when (1) there is be a valid contract between the parties; (2) the work being done is of an independent nature such that the contractor may employ nonexclusive means in accomplishing it;

21

(3) "[t]he contract calls for specific piecework as a unit to be done according to the independent contractor's own methods without being subject to the control and direction of the principal, except as to the result of the services to be rendered;" (4) a specific price is set for the overall undertaking; and (5) a specific time or duration is agreed upon and not subject to termination at the will of either side without liability for breach.  *Id.*

First, it is uncontested that there was a valid written contract between Atmos and Miller Pipeline.[86]  That weighs in favor of concluding Miller Pipeline is an independent contractor.

The second factor asks whether the work is of an independent nature such that non-exclusive means can be employed.  The parties' briefs (and, indeed, case law reviewed by the Court) are less than clear as to what this means, and how it differs substantively from the third factor.  *See, e.g.*, *Kibodeaux v. Progressive Ins. Co.*, 4 So. 3d 222, 226 (La. Ct. App. 3d Cir. 2009) (attempting to distinguish the two factors but concluding that they "are best analyzed together").

The Court again notes that these factors are not exclusive and are to be applied on a case-by-case basis.  *See, e.g.*, *McLeod*, 7 So. 3d at 192.  Rather than trying to unnecessarily clarify a murky point of Louisiana law, the Court will simply find that this factor is, by any interpretation, neutral as it relates to Miller Pipeline's status.

Most of the task request provisions clearly set forth the extent of the work (*e.g.*, replace the gas lines, fix the pavement after tearing it up).  However, a few of the task

---

[86] R. Doc. No. 71, at 5.

request's "Scope of Work" provisions seem to blur the line between setting forth *what* Miller Pipeline is to do and *how* it is to do it. The provision that Miller Pipeline will adhere to Atmos's operational manual while replacing the gas lines, for example, is hard to categorize.[87] It could easily be described as Atmos engaging Miller Pipeline to replace a gas line in a compliant manner. But what is the difference between that and engaging Miller Pipeline to replace a gas line and then telling it how to accomplish the task?

This ambiguity aside, Louisiana courts have frequently held that contractual provisions requiring contractor employees' adherence to the principal's policies and procedures do not prevent the finding of independent contractor status. *See, e.g.*, *Collins v. Home Depot, U.S.A.*, 182 So. 3d 324, 331 (La. Ct. App. 5th Cir. 2015) (finding independent contractor status despite safety provision requiring contractor to "comply with Home Depot's policies and procedures and attend Home Depot policy and procedure training at Home Depot's request"); *Perkins v. Gregory Mfg. Co.*, 671 So. 2d 1036, 1041 (La. Ct. App. 3d Cir. 1996) (finding independent contractor status despite contractual provision requiring contractor to "comply with all applicable federal, state and local statutes, rules of law, (OSHA) regulations, and all established safety rules and practices of [the principal]").

Moreover, most of the task request provisions are most easily described as setting forth *what* Miller Pipeline should do, albeit rather precisely. And it would be difficult to construe instructions, no matter how precise, as giving Atmos a right to

---

[87] R. Doc. No. 66-8, at 2.

supervise Miller Pipeline's work—particularly in light of the clear language of the MSA depriving Atmos of that right and the task request's clear statement that Miller Pipeline is to supervise its own work.  As Henderson points out, Atmos retained the right to inspect work.  But those rights are entirely consistent with the use of an independent contractor to accomplish a particular task.    *See, e.g.*, *Perkins*, 671 So. 2d at 1039 (concluding that the principal's right to inspect work is not inconsistent with an independent contractor relationship); *Guillory v. Conoco, Inc.*, 521 So. 2d 1220, 1223 (La. Ct. App. 3d Cir. 1988) (finding independent contractor status despite fact that principal "monitored the work progress and ran field tests").

Finally, while the task request indicates Atmos has the right to have incompetent Miller Pipeline crew members removed from the worksite (but not fired), Henderson offers no case law in support of the proposition that this is relevant to the relationship between Atmos and Miller Pipeline.  *See, e.g., Tate v. Progressive Sec. Ins. Co.*, 4 So. 3d 915, 919 (La. Ct. App. 4th Cir. 2009) (finding that trucker was independent contractor notwithstanding his statement that he "could easily be fired if [he] broke one of [the company's] safety rules"); *cf. McCleod*, 7 So. 3d at 194 (noting that the right to fire is relevant to establishing whether an independent contractor's employee is a borrowed servant of the principal).  And while the Court would find evidence that Atmos could *fire* Miller Pipeline's employees relevant (if not dispositive), Henderson does not suggest this is the case.

Relatedly, the third factor supports a finding that Miller Pipeline is an independent contractor.  The task request calls for Miller Pipeline to accomplish a

particular bit of work (the replacement project at Avenue A). *Cf. Reed v. Ross*, 297 So. 3d 29, 37 (La. Ct. App. 3d Cir. 2020) (finding summary judgment inappropriate where "the written contract at issue did not contemplate 'specific piecework as a unit,' but rather generally provided that Ross would provide hauling services 'at the direction of' [his employer]'").

Although the task request does include provisions that could be construed as an exercise of control by Atmos, control over day-to-day operations is *expressly* disclaimed by the MSA.  And while Henderson is right to point out that the MSA's disclaimer of control is not determinative, he fails to identify evidence that disputes it.  The very same task request that he describes as giving Atmos a right to extraordinary control of the work makes clear that only Miller Pipeline is to supervise day-to-day operations.  And Henderson identifies no evidence to suggest that this was not the case—in fact, it is undisputed that Atmos had no presence at the worksite during the days leading up to his accident.  Moreover, the fact that Atmos's approval was required before Miller Pipeline could engage in additional work beyond the scope of the project—a fact Henderson highlights—suggests strongly that this was a principal-independent contractor relationship.  It would seem backwards to find that principals, by limiting their contractors to certain tasks, create employees.

Henderson's most emphatic argument on this point—that the requirement that Miller Pipeline send Atmos invoices for its work is tantamount to the exercise of control over the work—is similarly nonsensical.  If demanding an invoice for services

rendered made someone an employee, the great majority of independent contractors would not be classified as such.

The fourth factor also weighs in favor of independent contractor status.  It is true that the price in the task request is described as an estimate.   However, Louisiana courts have concluded that an estimate for a project satisfies this inquiry. *See Certified Cleaning & Restoration, Inc. v. Lafayette Ins. Co.*, 67 So. 3d 1277, 1282 (La. Ct. App. 5th Cir. 2011) (finding trial court's determination that roofer was employee manifestly erroneous where, among other things, roofer provided an estimate, satisfying this factor).  Moreover, the MSA incorporates Miller Pipeline's schedule of fees for materials and work.

The final factor also weighs in favor of viewing Miller Pipeline as an independent contractor.  It is undisputed that the task request specified a timeframe in which the project was to be completed.  The Court notes, though neither party mentions it, that the work was not completed within the timeframe, as Henderson's accident occurred in late October, nearly a month after the project was to be accomplished.  If Henderson presented evidence that Atmos chose to ignore this, or regularly treated the deadlines included on its task requests as irrelevant, the Court would be inclined to look past the task request on this point.  But he has not.  Instead, Henderson's only argument on this point is that, because the MSA contains a provision allowing it to be terminated at will, there are no consequences for a breach. As Atmos points out, this is incorrect.  The MSA dictates that, should Miller Pipeline default, it will be responsible for the difference between its estimate and Atmos's

actual costs.  Moreover, if Atmos ultimately accomplishes the work for less than Miller Pipeline's estimate following a default, it is ultimately responsible for paying Miller Pipeline the difference.  *Cf. Burleigh v. Lee*, 2018 WL 1279830, at *6 (La. Ct. App. 1st Cir. Mar. 12, 2018) ("There is nothing in the . . . agreement that mandates that work on a purchase order be completed or else the breaching party is subject to liability.  Nor is there a provision in the agreement imposing liability on [employer] for failing to allow work on a purchase order to be completed.").

As outlined, the factors weigh in favor of treating Miller Pipeline as an independent contractor.  The Court notes that the analysis is to be performed on a "case-by-case basis" and "the most important inquiry is whether the principal retained the right to control the work."  *McLeod*, 7 So. 3d at 192.  The Court concludes that Atmos did not.

### B. Atmos did not Exert Operational Control over Miller Pipeline

Louisiana recognizes some circumstances in which a principal may be liable for the tortious conduct of its independent contractor.  As Henderson does not argue that Miller Pipeline was engaged in ultrahazardous activity, the relevant inquiry is whether Atmos "exercise[d] operational control over or expressly or impliedly authorize[d]" the work.  *See Goodie*, 2014 WL 1764777, at *3.  "Operational control exists only if the principal has direct supervision over the step-by-step process of accomplishing the work such that the contractor is not entirely free to do the work in his own way."  *Id.* at *3 (quoting *Fruge*, 337 F.3d at 564).  "'[I]nspection of the work done by an independent contractor and direction as to the final results of the project

is insufficient to support a conclusion that the principal has retained enough control over the project' to be liable for the independent contractor's negligence." *Koerner*, 2017 WL 4682295, at *12 (quoting *Nippa*, 774 So. 2d at 315).

As discussed above, no evidence supports a finding that Atmos directly supervised the work. It is true that Atmos retained the right to inspect the work. But—regardless of whether the fact Atmos assigned this responsibility to Magnolia is significant—a right to inspect the work is not the same as a right to control it. *See id.*

Henderson is tellingly silent on this point. His primary response to Atmos's argument that it lacked operational control is that Miller Pipeline was, in fact, controlled by Atmos. As discussed above, undisputed facts establish that this is incorrect.

## V.    CONCLUSION

Atmos did not employ Miller Pipeline. Nor did it exercise operational control over Miller Pipeline's day-to-day work. And it is undisputed that Miller Pipeline, not Atmos, conducted the work that Henderson alleges caused his injuries. Accordingly,

**IT IS ORDERED** that the motion for summary judgment is **GRANTED**. Henderson's claim is **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that Atmos's motion to exclude Eric Parnell from testifying at trial is **DISMISSED AS MOOT**.

New Orleans, Louisiana, December 28, 2020.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**